**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

*-and-*

**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*

United States District Court
Eastern District of New York

2:19-cv-05135

Annemarie Casio, Craig Moskowitz, Jane Doe, individually and on behalf of all others similarly situated

Plaintiffs

- against -

Vineyard Vines, LLC

Defendant

Complaint

Plaintiffs by attorneys alleges upon information and belief, except for allegations pertaining to plaintiffs, which are based on personal knowledge:

1. Vineyard Vines, LLC ("defendant") manufactures, produces distributes, markets, labels and sells high end yet wearable mainstream preppy clothing and accessories under the Vineyard Vines brand ("Products").

2. Defendant's clothing is evocative of New England chic, crossed with a Kenny

Chesney concert, layered with pastels.[1]

3. Defendant's prices are above a mass market department store, yet less than older brands such as Lacoste and Burberry.[2]

4. Defendant operates upwards of 70 retail stores ("main line stores" or "retail stores") and 19 outlet stores ("outlet stores") with at least 10 in New York.

5. The outlet and retail stores have similar interior layout, shelving, organization and available products.[3]

Outlet




Main Line



6. The outlet stores contain in-store placards promoting a 25% price reduction on all items, reflected on all price tags through a "Suggested Retail" Price which is 25% higher than the price consumers will pay, designated as "Our Price."

7. The attributes, features, designations and other criteria which apply to the exemplar

[1] Steven Bertoni, How Vineyard Vines Built A Giant Brand Without Raising A Penny Of Equity, Forbes, Apr. 10, 2018.

[2] "Older" in terms of existence of the brand.

[3] The outlet products, labels and tags identified in the complaint are examples of Outlet Products purchased by the named plaintiffs and class members and are referenced for purposes of explanation and comparison with the corresponding Retail Products.

products apply consistently across all of defendant's retail products, which have a corresponding outlet product in the same product line.

8. The outlet products purport to be identical to the retail products.

9. For example, the men's CHAPPY line of bathing suits is sold in the outlet and retail stores and they are difficult to distinguish at a glance.

10. The Product on the left (pink coconuts and pineapples) is the outlet product and the Product on the right (sharks) is the retail product.



11. The price tags for the above outlet and retail products is presented below.

<u>Outlet</u> <u>Main Line</u>







12. The Outlet and Retail Product Price Tags share many of the same markers and identifiers.

| | Outlet | Retail |
|---|---|---|
| **Suggested Retail** | $89.50 | $89.50 |
| **Actual Price ("Our Price")** | $69.99 | $89.50 |
| **Style Number** | 1M6062-459 | 1M000096-456 |
| **Style Name** | Bahama Mama Print Chappy | Striped Bonefish |
| **Product Line** | CHAPPY | CHAPPY |
| **Color** | TURQS | JAKE BLUE |
| **Bar Code** | 1 92926 19223 2 | 1 92926 60187 1 |
| **Miscellaneous** | OS319 | [blank] |

13. In the context of the Products, *viz*, the CHAPPY swimsuits, the most significant and apparent similarity between the price tags is that "Suggested Retail" price of the outlet product is identical to the "Price" of the retail product – $89.50.

14. Despite their similarity in appearance and classification, the outlet products' pricing is misleading because they do not have a true suggested retail price identical to the price for the comparative product in the retail store.

15. The invented price disparity between the "Suggested Retail" price, $89.50, and the actual "Our Price" of $69.99, induces customers to purchase the outlet products, by creating an impression of savings and "enhances subjects' perceived value and willingness to buy the product."[4]

16. The outlet products are not actually identical to the retail products, as they were not previously sold at the retail store nor transferred to the outlet store to clear space for a new season's merchandise, as shown through the interior tags of the Products.

Outlet

VINEYARD VINES
STYLE:1M6062
SEASON:OS319
PO:227361
SHENZHEN-DATE:01/19

Main Line

STYLE:1M000096
PO:229358
03/2019

[4] Dhruv Grewal & Larry D. Compeau, "Comparative Price Advertising: Informative or Deceptive?," 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992).

17. It can plausibly be surmised that the "OS" part of the "OS319" code on the outlet product price tag, and corresponding to "Season" on the interior tag directly above, is a designation for "Outlet Store."

18. The outlet product tag shows a production date of "01/19" or January 2019, while the main line product is dated "03/2019" or March 2019.

19. Due to seven months between the time the outlet product was made – not counting oceanic transport by container ship, processing through Customs, tagging the product prior to sale and domestic transport – it would have been impossible for the outlet product to be sold at a main line store of defendant.

20. However, reasonable consumers get the impression the outlet products are identical to the retail products due to the numerous intentional similarities and representations between the products sold at each store.

21. Upon information and belief, defendant's representatives in the outlet stores are directed, perhaps implicitly, to further these deceptive practices, by responding to customers from who ask about the relationship between the outlet and retail merchandise.

22. Customers are informed that the outlet products were either previously sold at retail stores or are of equivalent quality such that they could be.

23. Upon check-out, defendant provided customers with receipts which furthered the deceptive practices, through printing the Suggested Retail Price marked down by 25%, reassuring customers the items they purchased were worth more than they were.

24. These representations and intentional similarities are misleading, because the outlet products are of distinctly lower quality, evinced through the care tags.

<u>Outlet</u> <u>Main Line</u>







25. The Outlet Product is 100% polyester (lining and shell), compared to the Retail Product, which has a shell of 86% polyester and 14% spandex.

26. This difference in the Product's composition shows that the Outlet Product could not have had the suggested retail price equivalent to the retail product because the former is of lesser quality.

27. A comparable product of 100% polyester will be have a true market price of *more than 25% less* (less than $69.99, the actual price following 25% reduction from "Suggested Retail" price) than a product consisting of 86% polyester and 14% spandex, due to the prices of the fabrics.

28. The subtle nature of the differences between the outlet and retail products are such that they are deceptive to customers, who would not otherwise spend $69.99 for a bathing suit which is 100% polyester.

29. The "suggested retail" prices for the Outlet Products were not the prevailing market prices or values preceding the publication of said prices, as required by state law and/or the Federal

Trade Commission ("FTC").[5]

30. The information provided to consumers by sellers causes consumers to "stop a search based on dishonest price and quantity signals," such that "the transaction for the purchased item may yield an inferior result for the consumer than if the search had continued based on truthful information."[6]

31. Consumer willingness to pay more money for a product or service based on an initial higher list price is contrary to a rational economic model which "assumes all consumers care about is the value of the good and its selling price," in contrast to "robust evidence suggest[ing] consumers make consumption decisions that deviate from this model.[7]

32. This is because consumers value transactional utility – what they perceive as the "value of the 'deal.'"[8]

33. Consumers rely upon truthful information to manage their time constraints when searching for Products – in other words, allocating their scarce resources.

34. Through "dishonest search disruption" which distorts the information relied upon by consumers, sellers are able to short-circuit this search process, not only "inducing a purchase" by depriving consumers of informed choice but through amounts of money which can be measured.

35. Recent studies with abstract, virtual goods determined that "participants are willing to pay 57 cents to gain a dollar of perceived discount and 78 cents to avoid a dollar of perceived mark-up."[9]

---

[5] Federal Trade Commission Act ("FTCA") prohibiting "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).
[6] D. A. Friedman, "'Dishonest Search Disruption': Taking Deceptive-Pricing Tactics Seriously," 51 U.C. Davis L. Rev. Online 121 (2018).
[7] Jennie Huang, "The Thrill of the Deal: Quantifying the Price of Perceived Discounts and Mark-ups," (2018), Working Paper, Graduate Studies, Wharton School, University of Pennsylvania.
[8] *Id*.
[9] *Id*.

36. Defendant's "fictitious pricing" "'trap'[s] consumers into purchasing a more expensive good to exhaust the value" of the savings attributed to the price reduction, without regard for product quality.[10]

37. Only because of the fictious markdown were the items able to be sold at the lower "Our Price," due to their lesser quality, which exceeds the value of the price differential.

38. In other words, consumers are more likely to purchase the Products because the original price, $89.95, was above the selling price, $69.99.

39. Consumers would be significantly less likely to purchase the Products if the original price was below the selling price.

40. While studies had previously shown that "perceived discounts" lead to an increase in purchase intention, they did not "provide concrete evidence that reference prices may cause material losses for consumers."

41. Moreover, "irrelevant original prices," such as the "Suggested Retail" price of the Products, can be disentangled from "the effects of inferences about product-quality."

42. Had the Suggested Retail Price been a bona fide price, the customer would have a legitimate basis for evaluating whether the actual price was one they were willing to pay, absent the manipulation of the false reference price.

43. The false reference price also prevents the rational, reasonable consumer from independently evaluating what the product's true market price should be.

44. The differential between the true market price of the product and the price at which the retailer is able to sell the product utilizing its false discounting are the consumers' damages.

45. The "true market price" is the price that an item of similar quality would be sold for

[10] Huang at 4 ("I find that participants systematically forwent higher earnings and chose to purchase the good that uses up the entire value of the coupon almost 30% of the time").

at a completely different store, based on factors such as fabric type and quality, colors and drying.

46. Defendant knew the outlet products did not have a suggested retail price identical to the retail products because it ordered the outlet and retail products from a supplier, and necessarily paid less for the outlet products.

47. Named Plaintiffs and consumers reasonably and justifiably acted and relied on the substantial price differences advertised, and made purchases believing that they were receiving a substantial discount on an item of greater value than it was.

48. Named Plaintiffs and consumers would not have made their purchases or would have paid less for the Outlet Merchandise they did purchase, but for defendant's false representation of the "Suggested Retail" price accompanied by the illusory price discounts.

49. The Products and Pricing Practices are deceptive and injurious in other material and quantifiable ways.

Jurisdiction and Venue

50. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

51. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

52. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

53. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this District.

54. Venue is proper because many class members reside in this District and defendant does business in this District and State.

Parties

55. Plaintiff Casio is a citizen of Suffolk County, New York.

56. Plaintiff Moskowitz is a citizen of Fairfield County, Connecticut.

57. Plaintiff Casio purchased the products at one or more of defendant's outlet stores in this State during the statute of limitations.

58. Plaintiff Moskowitz purchased the products at one or more of defendant's outlet stores in this State and/or other States during the statute of limitations.

59. The items purchased by named plaintiffs have corresponding, similar, yet higher quality counterparts sold at defendant's retail stores and are represented in substantially identical form to the example(s) described herein.

60. Named Plaintiffs observed the in-store placards promoting a 25% price reduction on all items and price tags which represented the "Suggested Retail" Price to be 25% higher than the sale or "Our Price."

61. After observing the price tags on the items and the accompanying signage, Named Plaintiffs believed that they were receiving a significant discount on the item(s) they had chosen when in fact, the items would have cost less than they did.

62. Because they felt that the discounted price would likely not last, and that they were getting a significant bargain on the merchandise, they purchased the Products.

63. Jane Doe plaintiffs are citizens of the 48 states for which the identity of a named plaintiff has not been disclosed, but who were affected in the same manner as the Named Plaintiffs.

64. The allegations as related to laws of other states where no named plaintiff has been disclosed serves as a placeholder upon joinder or amendment.

65. Defendant is a Connecticut limited liability company with a principal place of business in Stamford, Connecticut (Fairfield County) and its members are citizens of Fairfield

County, Connecticut.

66. During the class period, Named and Jane Doe Plaintiffs purchased one or more of the Products for personal use, consumption or application based on the representations described herein, for no less than the price indicated, *supra*, excluding tax, within their districts and/or states.

67. Named and Jane Doe Plaintiffs purchased the Products based upon the representations with respect to price and implicit message of quality inherent in that price.

68. Named and Jane Doe Plaintiffs would consider purchasing the Products at defendant's outlet stores again if there were assurances that the Products' pricing representations were no longer misleading and priced the items at their true market price, less than the actual price the items were offered for sale at.

Class Allegations

69. The classes will consist of all consumers in all 50 states with sub-classes for the individual states.

70. The present complaint contains Named Plaintiffs from: New York, who will represent his/her/their state sub-classes of persons who purchased any Products containing the actionable representations during the statutes of limitation.

71. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if Named and Jane Doe Plaintiffs and class members are entitled to damages.

72. Named and Jane Doe Plaintiffs' claims and the basis for relief are typical to other members because all were subjected to the same representations.

73. Named Plaintiffs are adequate representatives because their interests do not conflict with other members.

74. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

75. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

76. Named and Jane Doe Plaintiffs' counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

77. Named and Jane Doe Plaintiffs seek class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350, Connecticut Unfair Trade Practices Act, Conn. Gen Stat § 42-110a, *et. seq.* and Consumer Protection Statutes of Other States and Territories

78. Named and Jane Doe Plaintiffs assert causes of action under the consumer protection statutes of the all 50 states, with Named Plaintiffs asserting the consumer protection laws of their individual states.

a. Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et. seq.*;
b. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et. seq.*;
c. Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. §§ 44-1521 *et. seq.*;
d. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et. seq.*;
e. California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.* and Unfair Competition Law, Cal. Bus. Prof. Code §§ 17200- 17210 *et. seq.*;
f. Colorado Consumer Protection Act, Colo Rev. Stat § 6-1-101, *et. seq.*;
g. Connecticut Unfair Trade Practices Act, Conn. Gen Stat § 42-110a, *et. seq.*;
h. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et. seq.*;
i. District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et. seq.*;
j. Florida Deceptive and Unfair Trade Practices, Act *Florida Statutes*§ 501.201, *et. seq.*;
k. Georgia Fair Business Practices Act, §10-1-390 *et. seq.*;
l. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1, *et. seq.* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statute § 481A-1, *et. seq.*;
m. Idaho Consumer Protection Act, Idaho Code § 48-601, *et. seq.*;
n. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et. seq.*;
o. Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-1 *et. seq.*;
p. Iowa Consumer Fraud and Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714.16 *et seq.*;
q. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et. seq.*;

r. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et. seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et. seq.*;
s. Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et. seq.*;
t. Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et. seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et. seq.*;
u. Maryland Consumer Protection Act, Md. Code, Com. Law § 13-101 *et seq.*;
v. Massachusetts Unfair and Deceptive Practices Act, Mass. Gen Laws Ch. 93A;
w. Michigan Consumer Protection Act, §§ 445.901, *et. seq.*;
x. Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et. seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et. seq.*;
y. Mississippi Consumer Protection Act, Miss. Code An. §§ 75-24-1, *et. seq.*;
z. Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*;
aa. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code § 30-14-101, *et. seq.*;
bb. Nebraska Consumer Protection Act, neb. Rev. Stat. § 59 1601 *et. seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et. seq.*;
cc. Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et. seq.*;
dd. New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et. seq.*;
ee. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et. seq.*;
ff. New Mexico Unfair Practices Act, N.M. Sta. Ann. §§ 57 12 1, *et. seq.*;
gg. New York General Business Law ("GBL") §§ 349 & 350;
hh. North Carolina General Statutes Chapter 75: Monopolies, Trusts and Consumer Protection, N.C. Gen. Stat. §§ 75-1.1 through 75-35;
ii. North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et. seq.*;
jj. Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109;
kk. Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et. seq.*;
ll. Oregon Unfair Trade Practices Act, Ore. Rev. Stat. § 646.608(e) & (g);
mm. Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1 *et. seq.*;
nn. Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et. seq.*;
oo. South Carolina Unfair Trade Practices Act, S.C. Code Law § 39-5-10, *et. seq.*;
pp. South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et. seq.*;
qq. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et. seq.*;
rr. Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41 *et. seq.*;
ss. Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-1 *et. seq.*;
tt. Vermont Consumer Fraud Act, Vt. Stat. Ann. Tit. 9, § 2451, *et. seq.*;
uu. Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196 *et. seq.*;
vv. Washington Consumer Fraud Act, Wash. Rev. Code § 19.86/0101, *et. seq.*;
ww. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et. seq.*;
xx. Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et. seq.*; and
yy. Wyoming Consumer Protection Act, Wyo. Stat. Ann.§§ 40-12-101 *et. seq.*;

79. Named and Jane Doe Plaintiffs and class members assert causes of action under the consumer protection laws of their States.

80. Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair because (1) it gives the impression to consumers the Products were of higher quality and value, (2) the outward similarity between the outlet and retail product makes it almost impossible to detect the subtle distinctions and (3) makes it unlikely customers will examine the Products to discover they are of different quality.

81. Defendant's acts, practices, pricing, advertising, labeling, packaging, representations and omissions are not unique to the parties and have a broader impact on the public.

82. Named and Jane Doe Plaintiffs and class members desired to purchase products which either were priced at the level set by the market for goods of the type sold at the outlet stores, a lower price than they actually paid.

83. After mailing appropriate notice and demand, Named and/or Jane Doe Plaintiffs who reside in a State where notice is required prior to seeking damages under that State's Consumer Protection Statutes, will have mailed and/or have amended this complaint to request damages. Cal. Civil Code § 1782(a), (d); Mass. UDAP, Mass. Gen Laws Ch. 93A, etc.

84. The deceptive pricing representations and omissions were relied on by Named and Jane Doe Plaintiffs and class members, causing damages.

<u>Negligent Misrepresentation</u>

85. Named and Jane Doe Plaintiffs and class members incorporate by reference all preceding paragraphs.

86. Defendant misrepresented the substantive, quality, compositional and other attributes of the Products through a fictious pricing scheme.

87. Defendant had a duty, established by the FTC and where applicable, the individual States, to disclose and/or provide non-deceptive pricing, marking and labeling of the Products and knew or should have known same were false or misleading.

88. This duty is based on defendant's position as an entity which has held itself out as having special knowledge in the production, service and/or sale of the product or service type.

89. The representations took advantage of cognitive shortcuts made by consumers at the point-of-sale and their trust placed in defendant, a well-known and widely recognized and respected brand in this sector for this type of product or service.

90. Named and Jane Doe Plaintiffs and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

91. Named and Jane Doe Plaintiffs and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty, Implied Warranty of Merchantability and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

92. Named and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

93. Defendant manufactures, markets, prices, labels and sells products at their outlet stores which are expected by customers to be of equivalent quality to items at their retail stores.

94. The Products warranted to Named and Jane Doe Plaintiffs and class members that they possessed substantive, qualitative, compositional and other attributes which they did not and that their prices were based on market forces.

95. Defendant had a duty to disclose and/or provide a non-deceptive pricing of the Products and knew or should have known same were false or misleading.

96. This duty is based, in part, on defendant's position as one of the most recognized

companies in this sector

97. The Products warranted to Named and Jane Doe Plaintiffs and class members that their prices were either a good deal or at worse, no less than the prices they were sold at, when they were worth less than such price.

98. Named and Jane Doe Plaintiffs provided or will provide notice to defendant and/or its agents, representatives or retailers.

99. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions and were not merchantable.

100. Named and Jane Doe Plaintiffs and class members relied on defendant's claims, paying more than they would have.

Fraud

101. Named and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

102. Defendant's purpose was to sell additional products in other channels at lower prices than sold at their retail prices.

103. Defendant induced these purchases through their deceptive practices and knew the suggested retail prices were false.

104. Defendant's fraudulent intent is evinced by its failure to accurately price the Products when it was in a position to do this.

105. Defendant's intent was to secure economic advantage in the marketplace against competitors and capture customers who would not otherwise shop at their retail stores due to the traditionally higher prices charged for a brands main line products.

106. Named and Jane Doe Plaintiffs and class members observed and relied on defendant's pricing and claims, causing them to pay more than they would have, entitling them to

damages.

Unjust Enrichment

107. Named and Jane Doe Plaintiffs incorporate by references all preceding paragraphs.

108. Defendant obtained benefits and monies because the Products were not as represented and expected based on their price and quality, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Named and Jane Doe Plaintiffs demand a jury trial on all issues.

**WHEREFORE,** Named and Jane Doe Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying named plaintiffs as representatives and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;
3. Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;
4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;
5. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and
6. Other and further relief as the Court deems just and proper.

Dated: September 10, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

*-and-*

Reese LLP
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
Facsimile: (212) 253-4272
*mreese@reesellp.com*

2:19-cv-05135
United States District Court
Eastern District of New York

---

Annemarie Casio, Craig Moskowitz, Jane Doe individually and on behalf of all others similarly situated

Plaintiff

- against -

Vineyard Vines, LLC

Defendant

---

Complaint

---

Sheehan & Associates, P.C.
505 Northern Blvd., #311
Great Neck, NY 11021
Tel: (516) 303-0552
Fax: (516) 234-7800

---

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: September 10, 2019

/s/ Spencer Sheehan
Spencer Sheehan